IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DARYL K. BURFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:20-cv-00549 |
| | ) | |
| CHRIS BRUN, et al., | ) | JUDGE RICHARDSON |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Before the Court is a pro se complaint for alleged violation of civil rights (Doc. No. 1), filed pursuant to 42 U.S.C. § 1983 by Plaintiff Daryl K. Burford, an inmate of the Trousdale Turner Correctional Center (TTCC) in Hartsville, Tennessee. In response to the Court's Order notifying Plaintiff of the deficiency in his original application for leave to proceed in forma pauperis (IFP), Plaintiff has now filed a new application to proceed IFP (Doc. No. 9), which the Court will grant by Order entered contemporaneously herewith. The complaint is now before the Court for an initial review pursuant to the Prison Litigation Reform Act (PLRA), 28 U.S.C. §§ 1915(e)(2) and 1915A, and 42 U.S.C. § 1997e.

**INITIAL REVIEW OF THE COMPLAINT**

I. PLRA SCREENING STANDARD

Pursuant to 28 U.S.C. § 1915(e)(2)(B), the Court must dismiss any IFP complaint that is facially frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. Similarly, Section 1915A provides that the Court shall conduct an initial review of any prisoner complaint against a

governmental entity, officer, or employee, and shall dismiss the complaint or any portion thereof if the defects listed in Section 1915(e)(2)(B) are identified. Under both statutes, this initial review of whether the complaint states a claim upon which relief may be granted asks whether it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," such that it would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Applying this standard, the Court must view the complaint in the light most favorable to Plaintiff and, again, must take all well-pleaded factual allegations as true. *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)). Furthermore, pro se pleadings must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). However, pro se litigants are not exempt from the requirements of the Federal Rules of Civil Procedure, *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989), nor can the Court "create a claim which [a plaintiff] has not spelled out in his pleading." *Brown v. Matauszak*, 415 F. App'x 608, 613 (6th Cir. 2011) (quoting *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975)).

II. SECTION 1983 STANDARD

Plaintiff seeks to vindicate alleged violations of his federal constitutional rights under 42 U.S.C. § 1983. Section 1983 creates a cause of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution

2

or federal laws. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). Thus, to state a Section 1983 claim, Plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution or laws of the United States, and (2) that the deprivation was caused by a person acting under color of state law. *Carl v. Muskegon Cnty.*, 763 F.3d 592, 595 (6th Cir. 2014).

III. ALLEGATIONS AND CLAIMS

Plaintiff sues the Commissioner of the Tennessee Department of Correction (TDOC), Tony Parker, as well as the TDOC Liaison at TTCC, Chris Brun, in their individual and official capacities. (Doc. No. 1 at 2.) He also sues CoreCivic, the private corporation that operates TTCC; the Warden of TTCC, Warden Byrd; and several individual employees of CoreCivic who are guards or nurses at TTCC. The events giving rise to his complaint are described below.

The complaint alleges that, on May 22, 2020, Sgt. Davis "displayed threatening and racial hostility" toward Plaintiff for coming onto the compound "with a compound access card . . . that was given to [Plaintiff] by the Ass. Warden before leaving the institution," in order to provide legal assistance to other inmates housed there. (Doc. No. 1 at 7.) Plaintiff claims that this hostile refusal to allow him onto the compound violated prison regulations and burdened his right to assist other inmates with their legal work. (*Id.* at 7–8.)

On May 24, 2020, from 6:30 a.m. until 6:00 p.m., Plaintiff was prevented by C.O. Thompson-Smith from leaving Pod-B, Charlie Bravo, on the orders of Capt. Williams. (*Id.* at 9.) Plaintiff claims that this detention also violated prison regulations and his right "to aide and assist other inmates with their legal documents." (*Id.*)

On May 25, 2020, "after stating that [his] life was in danger in Charlie Bravo" as a result of being "run around with a butcher knife," Plaintiff gathered his property and "wait[ed] on an escort to Fox-Charlie." (*Id.* at 10.) But Sgt. Davis, Sgt. Wright, and correctional officers Allen and

3

Stenike stated there was no room for Plaintiff in any other unit, handcuffed him, and forced him back into Charlie Bravo. (*Id.*) Plaintiff alleges that Sgt. Davis then "slammed [him] down on the table, using profanity and racial slurs," trying to provoke Plaintiff into a fight. (*Id.*) He claims that the failure to move him to a different pod under these circumstances violated prison policies and amounted to an unconstitutional failure to protect him from harm, as well as disparate treatment of similarly situated inmates. (*Id.* at 10–11.)

On May 26, 2020, at about 2:20 a.m., Plaintiff was awakened and extracted from his cell in Charlie Bravo by "CoreCivic Sort Team officials," who were retaliating against Plaintiff "by unconfirmed order of Chris Brun" for Plaintiff's "so-called assault[] [on] Chris Brun's girlfriend (nurse Anderson) in plaintiff's attempt to [exit] Charlie Bravo from a threatening situation concerning his life being in danger[.]" (*Id.* at 11.) He alleges that the Sort Team officials escorted him from Charlie Bravo in handcuffs, "stating you want to assault nurses, well you assaulted the wrong one this time old man," and "we'll see how tough you are." (*Id.* at 11–12.) Plaintiff was then taken to an intake holding cell, where a Sort Team official slammed him against the wall, resulting in a black eye. (*Id.* at 12.) Plaintiff's handcuffs were then removed, and the following events took place: the "lead Sort team member then slammed plaintiff to the floor, with his hands in plaintiff's chest, clinching plaintiff's shirt, tossed me from wall to wall, then banging me on the floor, kicked me in the stomach, and then spit on plaintiff as he was beginning to leave, stepping on plaintiff's right leg." (*Id.*) In a subsequent pleading,[1] Plaintiff alleges that this "lead Sort team

---

[1] This pleading is captioned "Plaintiff's Amended Complaint." It does not appear to be intended to supersede the original complaint entirely, and names the "Sort Team Member" Defendants that were unidentified in the original complaint. While the Court generally will not accept piecemeal amendments to a complaint, in an abundance of caution, and construing Plaintiff's pleadings in the light most favorable to him, the Court at this initial stage of review considers the amendment not as supplanting the original complaint at this initial stage of review, but as clarifying its allegations against particular Defendants. As this case proceeds, any amended complaint which Plaintiff seeks to file must stand on its own and, if allowed, will be viewed as his operative pleading rendering all previous iterations void.

member" is "now known as Sgt. Grassman," and that Sgt. Davis, Sgt. Wright, and C.O. Allen were the Sort team members who, in addition to Nurse Carter, "stood by, while plaintiff was being assaulted, an[d] watched." (Doc. No. 7 at 2–3.) Plaintiff alleges that this attack left him with a black eye, spots in his vision, and bruised ribs. (Doc. No. 1 at 14; Doc. No. 7 at 2–3.) He further alleges that, in the aftermath of his assault by Grassman, he "was left lying on the floor in intake holding cell, later being questioned by night Nurse Carter, then left in holding cell seven (7) hours with no medical attention or food to eat, until male intake Sgt. brought peanut butter, bread and crackers around 9:30 a.m." (Doc. No. 1 at 12.)

Plaintiff claims that the TDOC Liaison, Chris Brun, failed to "foresee or [e]nsure that excessive force would not be used to retaliate on Plaintiff," and generally failed to fulfill his duty of oversight. (*Id.* at 14.) Plaintiff also claims that TDOC Commissioner Tony Parker and Warden Byrd failed in their duty of oversight, thus allowing for the occurrence of the violations described in the complaint. (*Id.* at 15.)

As relief, Plaintiff seeks, e.g., an award of damages and the appointment of a special investigator "to examine whether systemic deficiencies contribute to misconduct or enable it to persist" at TTCC and other CoreCivic facilities. (*Id.* at 6, 16.)

IV. ANALYSIS

Plaintiff fails to state a viable claim to relief based on the events of May 22 and 24, 2020, when he was restricted from entering the compound or leaving his pod in order to provide legal assistance to other inmates, in violation of prison regulations. "[T]here is technically no independent right to assist" other inmates with their legal matters, though "prison officials may not prevent such assistance or retaliate for providing such assistance where no reasonable alternatives are available" to the inmate in need of legal help. *Gibbs v. Hopkins*, 10 F.3d 373, 378

5

(6th Cir. 1993). The concern with reasonable alternatives stems from the recognition that, without such alternative avenues for guidance on law and procedure, inmates deprived of the assistance of a jailhouse lawyer could effectively be denied their constitutional right of access to the courts. *Id.* But just as there is no "freestanding right" to receive a fellow inmate's legal advice when access to the courts is not otherwise prevented, there is no freestanding right to provide such advice. *Shaw v. Murphy*, 532 U.S. 223, 231 & n.3 (2001). Plaintiff does not allege that his treatment resulted in any other inmate being unable to access the courts; in fact, he alleges that other inmate legal assistants at TTCC were not restricted as he was. He bases his claims on his own alleged First and Fourteenth Amendment rights to provide such assistance, as well as TDOC policies 501.02 and 501.04. (Doc. No. 1 at 7–10.) Because neither the Constitution nor prison policy provides grounds for such relief, *see*, *e.g.*, *Grinter v. Knight*, 532 F.3d 567, 574 (6th Cir. 2008) (finding that failure to follow prison policy or procedure did not infringe inmate's constitutional rights), these claims will be dismissed.

Additionally, the alleged fact that certain Defendants directed profane and abusive language including racial slurs toward him, or otherwise verbally threatened him, while reprehensible, does not support a constitutional claim. *See Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) (finding that verbal abuse or harassment does not violate Constitution); *Jones Bey v. Johnson*, 248 F. App'x 675, 677–78 (6th Cir. 2007) (finding "use of racial slurs and other derogatory language" does not violate Constitution); *Watison v. Smith*, No. 2:16-CV-2910-STA-EGB, 2018 WL 3040578, at *3 (W.D. Tenn. June 19, 2018) (same) (citing *Pasley v. Conerly*, 345 F. App'x 981, 984 (6th Cir. 2009), and *Jones Bey*, 248 F. App'x at 677–78).

As to Plaintiff's claims related to the events of May 25, 2020, the incident involving his allegedly being chased with a butcher knife—which led to Plaintiff's exit from Charlie Bravo and

6

apparent "assault" of Nurse Anderson along the way, followed by his subsequent physical restraint and escort back into Charlie Bravo—does not support his claim that the correctional officers who refused to relocate him to a new pod failed in their constitutional duty to protect him from harm. In order to state a viable failure-to-protect claim, an inmate must show that officials were deliberately indifferent "to a substantial risk of serious harm" to the inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004). To meet this standard, the inmate must show that officials were "subjectively aware of the risk" and "disregard[ed] that risk by failing to take reasonable measures to abate it." *Greene*, 361 F.3d at 294 (quoting *Farmer*, 511 U.S. at 847). Here, Plaintiff has merely alleged that, after gathering his property and awaiting prison officials in the Charley Building rotunda, he told the officials who arrived that his "life was in danger after being run around with a butcher knife." (Doc. No.1 at 10.) He does not allege that he told any Defendant the name of the inmate who wielded the knife or how he escaped harm, just that his life was in danger in Charlie Bravo and he needed to be relocated. (*Id.*) These sparse allegations, coupled with the fact that Plaintiff was not harmed by his fellow inmate, indicate that his claim is not based on any actual, identifiable harm, but on "a failure to prevent exposure to risk of harm," which the Sixth Circuit has held is not a compensable injury. *Wilson v. Yaklich*, 148 F.3d 596, 601 (6th Cir. 1998) ("[I]t is the reasonably preventable assault itself, rather than any fear of assault, that gives rise to a compensable claim under the Eighth Amendment.") (quoting *Babcock v. White*, 102 F.3d 267, 272 (7th Cir. 1996)).

However, a colorable excessive-force claim is asserted against Defendants Grassman, Davis, Wright, Allen, and Carter, based on the events alleged to have occurred early in the morning on May 26, 2020 in an intake holding cell at TTCC. "[T]he Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their

7

sentences." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010). In such cases, the "core judicial inquiry" is "not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). There is also an objective component to Eighth Amendment excessive-force claims, which requires the pain inflicted to be sufficiently serious. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)).

Plaintiff alleges that, with Davis, Wright, Allen, and Carter looking on, Grassman slammed him against the cell wall while he was handcuffed, and then (after removing the handcuffs) slammed him to the floor and tossed him from wall to wall before kicking him in the stomach, spitting on him, and stepping on his leg on the way out of the intake cell. Plaintiff alleges that this application of force was explicitly in response to his interaction with Nurse Anderson the previous day and left him with a black eye and bruised ribs. (Doc. No. 1 at 11–12, 14.) Taking these allegations as true and construing them in Plaintiff's favor, as the Court must at this initial stage, they are sufficient to state a plausible claim that Grassman inflicted an objectively serious level of pain by using force "maliciously and sadistically to cause harm." *See Wilkins*, 559 U.S. at 37.

Furthermore, if the onlookers—Sgt. Davis, Sgt. Wright, C.O. Allen, and Nurse Carter—either supervised Grassman or owed Plaintiff a duty of protection, they too may be liable for Plaintiff's injuries. *See Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013) (addressing liability of prison guard and nurse who witnessed another guard's use of excessive force); *see also Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). Any such "officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the

8

means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). At this early stage of the proceedings, the Court finds that the complaint sufficiently alleges the liability of Davis, Wright,[2] Allen, and Carter for the harms inflicted by Grassman. The complaint therefore states a nonfrivolous claim of excessive force against these Defendants which will be allowed to proceed.

However, Plaintiff's allegation that this assault was carried out "by unconfirmed order of Chris Brun" for Plaintiff's "so-called assault[] [on] Chris Brun's girlfriend (nurse Anderson)" (Doc. No. 1 at 11) is too speculative to support a viable claim against Brun at this point. Although deserving of a liberal construction, pro se pleadings are not exempt from the requirement of alleging facts sufficient to state a plausible claim to relief. Plaintiff's suspicion that the assault was ordered by Brun is not a factual allegation, and the alleged relationship between Brun and Anderson is not alone sufficient to support Plaintiff's Eighth Amendment claim against either Defendant. Similarly, the allegation that Nurse Carter "questioned" Plaintiff but did not provide him with medical care in the immediate aftermath of the assault (Doc. No. 1 at 12) is not alone sufficient to state a claim for deliberate indifference to serious medical needs. If facts implicating Brun and/or Anderson in the assault, or Carter in any denial of necessary medical treatment, are revealed in discovery, Plaintiff may seek to amend his complaint accordingly.

The complaint also fails to state a colorable claim for failure of proper oversight or supervision by Brun, TDOC Commissioner Tony Parker, CoreCivic, or TTCC Warden Byrd. Section 1983 liability cannot be predicated upon a *respondeat superior* theory, or upon a supervisor's mere failure to act. *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016)

---

[2] Plaintiff's other allegation against Defendant Wright—that, 23 days after the assault, Wright further retaliated against him by improperly keeping him at recreation for an hour and a half, causing him to miss his morning time slot for accessing the law library (Doc. No. 7 at 6)—fails to reference any injury that could rise to the level of a constitutional violation.

9

(citing, *e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). "In other words, a supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Id.* (citing *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)). Nor can a corporate entity like CoreCivic be held liable under Section 1983 on a theory of *respondeat superior* or vicarious liability, but only upon allegations that the execution of a specific corporate policy or custom caused the harm complained of. *Welch v. CoreCivic Inc.*, No. 3:17-cv-01516, 2018 WL 5808728, at *1 (M.D. Tenn. Nov. 6, 2018) (citing *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003)). Plaintiff does not allege that any supervisory Defendant actively participated in the infliction of harm upon him, or that any harm resulted from the execution of an overarching policy or custom. Rather, he alleges that he was harmed "when policy/protocol was not followed" by individuals who treated him "disparately as compared to similarly situated persons/inmates." (Doc. No. 1 at 11, 12.) The complaint thus fails to state a viable claim against TDOC officials Brun and Parker,[3] or against CoreCivic and its employee Warden Byrd.

## **CONCLUSION**

For the reasons set forth above, the Court finds that the complaint states a colorable excessive-force claim against Defendants Grassman, Davis, Wright, Allen, and Carter, which will proceed for further development. All other Defendants will be dismissed from this action.

---

[3] To the extent that Plaintiff seeks to recover damages against these individuals in their official capacities (*see* Doc. No. 1 at 2), no viable claim can be maintained against them because they are state officials, employed either by the State of Tennessee or by TDOC, a state agency. *See Tillman v. Woodall*, No. 3:13-cv-0762, 2013 WL 4049977, at *4 (M.D. Tenn. Aug. 9, 2013). In a suit for damages, "neither a State nor its officials acting in their official capacities are 'persons' [subject to suit] under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Furthermore, "the Eleventh Amendment bars § 1983 suits seeking money damages against states and against state employees sued in their official capacities." *Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003) (citing *Will*, 491 U.S. at 66).

10

An appropriate Order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE